Rafey S. Balabanian (315962)
rbalabanian@edelson.com
Aaron Lawson
alawson@edelson.com (319306)
EDELSON PC
123 Townsend Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435
*Counsel for Plaintiff and the Putative Classes*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| JONATHAN CARMEL, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>MIZUHO BANK, LTD., a Japanese financial institution, and MARK KARPELES, an individual,<br><br>*Defendants.* | Case No.<br><br>**Class Action Complaint** |

## CLASS ACTION COMPLAINT

Plaintiff, Jonathan Carmel ("Plaintiff") brings this Class Action Complaint and Demand for Jury Trial against Defendants Mark Karpeles ("Karpeles") and Mizuho Bank, Ltd. ("Mizuho"). Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

1

## NATURE OF THE ACTION

1. This case involves the demise of the Mt. Gox Bitcoin Exchange ("Mt. Gox" or the "Exchange") and the loss of hundreds of millions of dollars worth of its users' bitcoins and cash ("Fiat") Currency. Defendant Mark Karpeles, who owned and ran Mt. Gox, was responsible for the loss of more than $400 million from users on the Exchange through either gross negligence or outright theft. Plaintiff brings suit on behalf of a class of similarly situated individuals to recover their resulting losses from Karpeles.

2. Although Karpeles is the most notorious actor in the Mt. Gox collapse, Mt. Gox's banking partner, Defendant Mizuho Bank, bears significant responsibility as well. As discussed below, in mid-2013, Mizuho created a number of artificial hurdles in hopes of forcing Mt. Gox to sever relations with it. The most significant of these hurdles was to stop processing any withdrawal requests made by Mt. Gox users in the United States, thus causing thousands of withdrawal requests submitted to Mt. Gox to go unfulfilled. In this sense, Mizuho was akin to the famous Hotel California, money could check into the bank at any time, but once there, it could never leave. Plaintiff thus also brings suit on behalf of a subclass of similarly situated individuals who attempted, but failed, to withdraw money from their Mt. Gox accounts after Mizuho made the decision to stop allowing withdrawals.

## PARTIES

3. Plaintiff Jonathan Carmel is a natural person and citizen of the State of California.

4. Defendant Mark Karpeles is a natural person and citizen of the country of France. During the events alleged in this Complaint, Karpeles served as the Chief Executive Officer of both Mt. Gox KK and its parent company, Tibanne KK. Additionally, Karpeles is the sole shareholder of Tibanne KK. Based on Mt. Gox's own statements, "Mark Karpeles is the President and CEO of both MtGox and

2

Tibanne. Mark providers [sic] overall direction, responsible for supervising main operations and steering the company according to his vision." Through Tibanne KK and the Mt. Gox Exchange, Karpeles conducted business throughout this District, the State of California, and the United States.

5. Defendant Mizuho Bank is a Japanese financial institution with its principal headquarters located at 1-3-3, Marunouchi, Chiyoda-ku, Tokyo, Japan 100-8210. Mizuho Bank conducts business worldwide. Mizuho Bank has received and processed wire money deposits and withdrawals for Mt. Gox customers residing in this District, the State of California, and the United States.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Classes is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to this action.

7. This Court has personal jurisdiction over Defendants because they conduct business in this District and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from this District.

8. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from this District.

## COMMON FACTUAL ALLEGATIONS

***The Mt. Gox Bitcoin Exchange.***

9. Founded in 2009, Mt. Gox at one time claimed to be the "world's most established Bitcoin exchange." In addition to buying and selling bitcoins, Mt. Gox promised its customers "the ability to securely store Bitcoin in a virtual 'vault' for safe keeping" on its servers. It further promised that its website would be "always on"

3

so that users could "[b]uy and sell Bitcoin 24/7/365 with the world's most sophisticated trading platform."

10. To use Mt. Gox's service, customers were required to sign up for an account at www.mtgox.com and agree to Mt. Gox's Terms of Use, which expressly stated that "MtGox represents and warrants that . . . it will hold all monetary sums and all Bitcoins deposited by each Member in its Account, in that Member's name as registered in their Account details, and on such Member's behalf."

11. Customers were also asked to verify their accounts by providing Mt. Gox with detailed information, such as their full name, date of birth, country of birth, physical address, and proof of identity (such as a state issued identification card).

12. To make purchases and trades on the Exchange, users could transfer bitcoins directly into their Mt. Gox accounts or deposit cash into their accounts by wiring money to Mt. Gox's banking partner—Defendant Mizuho Bank. After receiving the funds, Mizuho Bank would transfer the money into an account that it held on behalf of Mt. Gox.

13. Mt. Gox received a transaction fee for each trade made on the Exchange. Upon information and belief, Mt. Gox made tens of thousands of dollars per day in transaction fees from customers on its site.

***Mark Karpeles—The Mastermind Behind Mt. Gox.***

14. As President, CEO, and majority shareholder of Mt. Gox, Karpeles controlled all aspects of Mt. Gox's business from the ground up. In fact, Karpeles was involved in nearly every detail of the Exchange, from the technical (Karpeles wrote and designed the software used to run Mt. Gox) to the operational (Karpeles handled all of Mt. Gox's third party negotiations and contracts).

15. Karpeles likewise directed the drafting and dissemination of Mt. Gox's public statements and representations (including those made through its Terms of Use), as well the statements made through Mt. Gox's customer service department. In

4

addition, Karpeles handled all aspects of Mt. Gox's accounting (including its maintenance of user and operational accounts) and banking affairs—personally representing Mt. Gox in its negotiations and discussions with banks and third-party payment processors.

16. As the sole controlling force behind Mt. Gox and the designer of its software, Karpeles was aware that there were security "bugs" in the system as early as 2011.

17. Rather than correcting the security bugs (or informing users of their existence), Karpeles knowingly concealed the defects from the public and falsely assured users that their bitcoins and money were safe in their accounts.

***Mizuho Bank's Banking Relationship With Mt. Gox.***

18. Defendant Mizuho Bank was Mt. Gox's bank partner in Japan and maintained Mt. Gox's operating accounts. In that capacity, Mizuho Bank facilitated international cash wire transfers into the Exchange and processed user requests to withdraw cash from the Exchange to their outside bank accounts.

19. To facilitate wire transfers into the Exchange, Mizuho accepted payments that had been wired by users through their outside banks (e.g. Bank of America). Such wire transfers designated Mt. Gox as the beneficiary of the wire and Mizuho as the beneficiary's bank, and included the Mt. Gox user's account number to which the funds were to be directed. After accepting the wire payment, Mizuho thereafter deposited the funds into its account for Mt. Gox with the funds marked on behalf of the specific depositing Mt. Gox user.

20. To withdraw cash from the Exchange, Mt. Gox users submitted requests online through their Mt. Gox account. Mt. Gox would compile the requests it received—which included such information as the user's banking details and the amount to be transferred—and provide the requests to Mizuho for processing. After receiving the requests, Mizuho would then transfer out the requested amounts to the

user's bank.

21. In mid-2013, Mizuho Bank was the exclusive processor of all bank deposits and withdrawals made by Mt. Gox users located in the United States.

***Mizuho Bank Became Concerned With Karpeles' Business and Implemented New Banking Policies Designed to Coerce Karpeles Into Dissolving Their Partnership.***

22. Beginning in 2013, Mizuho Bank became increasingly concerned by Mt. Gox's growing transaction volumes amid reports that U.S. authorities were investigating Mt. Gox for business dealings related to money laundering. At the same time, Mizuho Bank faced its own legal troubles at home, with reports surfacing that the bank had knowingly loaned money to organized crime syndicates and was under investigation by Japan's Financial Services Agency.

23. Accordingly, fearing that the partnership would expose it to further regulatory scrutiny and cause significant reputational harm, Mizuho Bank decided that it wanted to distance itself from Karpeles and Mt. Gox. However, for its own purposes, Mizuho Bank wanted Karpeles to be the one to officially sever the banking relationship. To that end, Mizuho asked Karpeles to close Mt. Gox's account at Mizuho. He refused.

24. In order to pressure Karpeles into rethinking his decision and force an end to the banking relationship, Mizuho began implementing a series of new policies in the beginning of 2013. These new policies—all of which were kept secret from the public—were meant to frustrate and disrupt Mt. Gox's business and relationship with its customers. Chief among these new measures was refusing to process international wire transfer requests.

25. Ultimately, in June 2013, Mizuho stopped processing international wire withdrawals for Mt. Gox altogether.

26. Accordingly, in June 2013, Mt. Gox users began to report substantial difficulties in withdrawing cash from their Mt. Gox accounts—wondering online

6

about the source of the delays.

27. Mizuho knew that if US customers found out about its new unreasonable banking policies (especially, the fact that withdrawals were no longer allowed), they would no longer continue making deposits into the Exchange and it would cease collecting the associated fees. Mizuho also harbored concerns that if its banking policies became publicly known, it could suffer reputational damage or potentially be blamed for losses. Nevertheless, Mizuho continued to accept user deposits into the Mt. Gox Exchange (for which it collected fees on each transaction) through its collapse in February 2014.

28. On information and belief, Mizuho continued accepting customer deposits in order to further the impression that any withdrawal difficulties were solely attributable to Mt. Gox, so as to avoid drawing public criticism and further scrutiny from regulatory authorities.

**Defendants Concealed Mt. Gox's Operational Difficulties and Continued Accepting Cash Deposits.**

29. In February 2014, Karpeles made numerous representations to the public and to Mt. Gox users that the withdrawal issues were only temporary and that user assets were safe.

30. Karpeles also assured users through the Mt. Gox online Support Desk (which he directed and controlled) that any problems were being dealt with and that there was no cause for alarm. Likewise, users who inquired about withdrawal delays were informed that any withdrawal issues were only temporary and that delays in transaction speeds were merely "due to a change in [Mt. Gox's] banking systems" which had resulted in a "back-log" of requests that needed to be processed." Karpeles even claimed that Mt. Gox was "trying to form relationships with several new banking partners both in Japan and around the world" and "in the process of finalizing even more," meaning that it would "have increased stability and ability to

transmit withdrawals going forward."

31. Both Karpeles and Mizuho knew that these statements were false—withdrawal delays were not due to any "backlog" in the system; they were not minor issues and they were not temporary. Rather, withdrawal delays were due to Mizuho's refusal to process international withdrawal requests and its broader efforts to undermine the banking relationship between it and Mt. Gox.

32. Although Mizuho knew that Karpeles was making these false and misleading statements to the public and to his Mt. Gox users, it took no action to correct them. Instead, Mizuho concealed that it was the cause of the Mt. Gox withdrawal delays, concealed the fact that it had implemented banking policies designed to disrupt Mt. Gox's business and relationship with its users, and stood silent while allowing the public to continue being duped.

33. Upon information and belief, Mizuho prohibited Mt. Gox from disclosing that withdrawal difficulties were attributable to Mizuho, or that Mizuho wanted to terminate its banking relationship with Mt. Gox. By continuing to accept deposits, Mizuho further contributed to the false narrative that the Mt. Gox Exchange was operating properly and that problems with withdrawals were not serious or attributable in any way to Mizuho.

34. On February 7, 2014, Karpeles halted his customers' ability to withdraw any bitcoin from Mt. Gox, stating that he was purportedly investigating a "bug" or "technical malfunction" in the Bitcoin network. A few days later, on February 10, 2014, Karpeles claimed that he had supposedly detected "unusual activity" with respect to the Mt. Gox Bitcoin wallets and was investigating a technical issue, called "transaction malleability," which he said involved the ability of third parties to manipulate certain transactions. Karpeles nonetheless assured his customers that "MtGox will resume bitcoin withdrawals to outside wallets once the issue" had been addressed. This statement was also knowingly false, and beyond that, Karpeles

concealed the fact that he had been aware of the supposed security "bug" since 2011.

35. However, despite that the fact that most users were now unable to withdraw any bitcoins or Fiat Currency from their accounts, and even though both Karpeles and Mizuho knew that full withdrawal functionality (which had been made available to Mt. Gox users prior to Mizuho's decision to no longer process withdrawals) would never be restored, both Defendants nonetheless continued to accept and profit from more user deposits.

***Karpeles Shut Down Mt. Gox and Declared Bankruptcy.***

36. On February 24, 2014, the Mt. Gox website "went dark." Customers who visited the site found nothing but a blank page and were unable to view or access their accounts. A message on the Mt. Gox website later notified members that a "decision was taken to close all transactions *for the time being*." That statement was not true because, at that time, Karpeles was already planning on seeking bankruptcy protection and, on information and belief, was in the process of preparing Mt. Gox's bankruptcy filing.

37. A few days later, on February 28, 2014, Mt. Gox filed for bankruptcy protection in Japan. In its petition (supported by a declaration from Karpeles), Karpeles revealed that he had known about the security "bug" since May 2011 but that it was not purportedly known "until the end of January 2014 that [the bug] could lead to a large number of unconfirmed transactions and to a risk of illicit withdrawals." The petition further stated that Mt. Gox had discovered "a large discrepancy in the total of deposit balances at those financial institutions which managed said deposits compared to the total amount actually deposited by users and that there was a large shortfall of deposit balances."

38. During a press conference, Karpeles revealed that Mt. Gox had assets of over $20 million (USD) and liabilities in excess of $65 million (USD)—not including the over $450 million worth of bitcoins it had lost through its supposed security

9

breach. In later bankruptcy filings, he revised those figures to $37.7 million (USD) in assets and $63.9 million (USD) in liabilities. *See* Declaration of Robert Marie Mark Karpeles, ¶ 7, ECF No. 3, No. 14-31229-sgj15 (Bankr. N.D. Tex. Mar. 9, 2014).

39. In the days that followed, reports emerged suggesting that Karpeles grossly mismanaged the Mt. Gox Exchange by ignoring known security flaws and user reports of hacking, failing to segregate customer and operational funds in Mt. Gox's account, failing to periodically balance and/or reconcile customer and operational funds, and losing user bitcoins that were purportedly stored in its offline storage.

40. On June 18, 2014, the Bankruptcy Court in the Northern District of Texas officially recognized Mt. Gox's Japanese bankruptcy proceedings as a foreign main proceeding under Chapter 15 of the U.S. Bankruptcy Code, effectively staying all pending litigation against it in the United States. *See In re MtGox*, Case No. 14-31229-sgj15 (Bankr. N.D. Tex.).

41. Tibanne KK likewise declared bankruptcy in Japan in February 2015, with recognition as a Chapter 15 foreign main proceeding being granted on April 2, 2015. *See In re Tibanne Co., Ltd., a/k/a KK,* Case No. 15-10255-REG (Bankr. S.D.N.Y.).

42. In September 2015, Karpeles was arrested by Tokyo police and formally charged with fraud and embezzlement in connection to his management of Mt. Gox. To date he has not been convicted or acquitted.

## PLAINTIFF'S FACTUAL ALLEGATIONS

*Facts Relating to Plaintiff Jonathan Carmel*

43. Plaintiff Carmel joined Mt. Gox in or around March 27, 2013 after reading Mt. Gox's representations about the Exchange's security, reliability, and ability to withdraw or deposit bitcoins and/or Fiat Currency at any time (substantially similar to the advertisements and representations described in Paragraphs 9-10

10

above). Shortly after joining, Carmel transferred bitcoin into Mt. Gox.

44. As a member of Mt. Gox, Carmel paid transaction fees to Mt. Gox on every trade that he made, in part, to be able to buy, sell, trade, and withdraw bitcoins, and also, in part, to maintain and protect his bitcoins.

45. In November 2013, Carmel converted his bitcoin to Fiat Currency with the intention of immediately withdrawing $52,493.22 USD from his Mt. Gox account.

46. On November 20, 2013, Carmel submitted a withdrawal request for $52,493.22 USD from his Mt. Gox account, with instructions to deposit the funds in his U.S. bank account. That same day, Carmel received an email from Mt. Gox confirming that the withdrawal request had been received. Carmel, however, did not receive the withdrawn funds.

47. Following his withdraw request, Carmel waited several weeks for the money to appear in his bank account.

48. On or around February 2014, Carmel received a message from Mt. Gox customer support indicating that all international withdrawals were delayed.

49. Soon thereafter, the Mt. Gox Exchange went dark.

50. At no time prior to or during the transfer of his bitcoins into the Exchange, did Mt. Gox or Mizuho notify Carmel that Mt. Gox had suffered any type of "bug," that Mizuho was no longer providing withdrawal services to Mt. Gox users (and thus, that any withdrawal requests might be completely frustrated), or that any funds within the Exchange (bitcoin or Fiat Currency) would be permanently inaccessible.

51. Had Carmel known that Mizuho was interfering with Mt. Gox's ability to service users, that his ability to make cash withdrawals from the Exchange would be materially compromised, that the security of Mt. Gox had been compromised, or that Mt. Gox intended to go offline and declare bankruptcy, he would not have

11

opened his account with Mt. Gox or transferred bitcoins into the Exchange, and/or would have taken immediate steps to withdraw his bitcoins from the Exchange.

## CLASS ALLEGATIONS

52. **Class Definition**: Plaintiff Carmel brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> **Mt. Gox Class**: All persons in the United States who had bitcoins or money stored with Mt. Gox on February 24, 2014.

Plaintiff further bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of himself and a Subclass of similarly situated individuals, defined as follows:

> **Withdrawal Subclass**: All members of the Mt. Gox Class who initiated a request to withdrawal Fiat Currency from their Mt. Gox account after the date in which Mizuho Bank stopped processing withdrawals, and whose withdrawal request was not fulfilled.

(The Class and Subclass are referred to herein as the "Classes".) Excluded from the Classes are (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendants, and (5) the legal representatives, successors, or assigns of any such excluded person.

53. **Numerosity**: The exact number of the members of the Classes is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, and according to documents filed

by Mt. Gox in support of their bankruptcy petition, there are likely over 1,000 members in each of the respective Classes. Members of the Classes can be identified through Defendants' records.

54. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the members of the putative Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

  (a) whether Karpeles adequately managed and safeguarded Plaintiff's and the members of the Classes' bitcoins and Fiat Currency;

  (b) whether Karpeles' conduct constitutes fraud; and

  (c) whether Mizuho's conduct constituted tortious interference.

55. **Typicality**: Plaintiff's claims are typical of the claims of other members of the Classes, in that Plaintiff and the members of the Classes sustained damages arising out of Defendants' uniform wrongful conduct.

56. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Classes, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiff.

57. **Superiority**: This case is appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. The damages suffered by the individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Classes to obtain effective relief from Defendants' misconduct. Even if members of the Classes could sustain such

individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

### FIRST CAUSE OF ACTION
### Negligence Against Mark Karpeles
### (On behalf of Plaintiff and the Mt. Gox Class)

58. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

59. Karpeles owed Plaintiff and the Mt. Gox Class a duty of reasonable care to employ procedures to detect and prevent the improper access and misuse of Plaintiff's and the Class's bitcoins and Fiat Currency and also to allow them complete access to the same. This duty arose from Karpeles' relationship with Plaintiff and the Mt. Gox Class.

60. Karpeles breached his duty to the Plaintiff and the Mt. Gox Class by failing to exercise reasonable care in maintaining, protecting, accounting for, and safeguarding the Plaintiff's and the Mt. Gox Class's bitcoins and Fiat Currency within Mt. Gox's control. This included the failure to implement reasonable accounting procedures or to segregate user accounts from operational funds, as well as the failure to correct security bugs or other vulnerabilities on the Exchange.

61. Karpeles further acted negligently by failing to implement security procedures to detect and prevent unauthorized access to Plaintiff's and the Mt. Gox Class' bitcoins and Fiat Currency.

62. As a result of Karpeles' conduct, Plaintiff and the Mt. Gox Class suffered economic injury and other damages, in the form of the price of their bitcoins and Fiat Currency that were accessed, frozen, stolen, and/or misused or that are

present in their Mt. Gox accounts and which they cannot access.

63. But for Karpeles' negligence, Plaintiff's and the Mt. Gox Class's bitcoins and Fiat Currency would not have been compromised and/or lost. The Plaintiff's and Class's bitcoins and Fiat Currency were accessed, frozen, stolen, and/or misused as the proximate result of Karpeles' failure to exercise reasonable care in safeguarding such information by adopting, implementing, and maintaining appropriate data management, accounting, and security measures.

64. The injuries to Plaintiff and the Mt. Gox Class resulting from Karpeles' negligence were reasonably foreseeable, particularly in light of his grossly inadequate accounting, data management, and security processes.

65. Plaintiff and the Mt. Gox Class seek to recover the economic injury and other damages suffered as a result of Karpeles' unlawful conduct, including in the form of the price of the bitcoins and Fiat Currency that were in their Mt. Gox accounts at the time it went dark that is not recoverable under the liquidation proceedings in Mt. Gox's Japanese bankruptcy.

**SECOND CAUSE OF ACTION**
**Fraud Against Mark Karpeles**
**(On behalf of Plaintiff and the Mt. Gox Class)**

66. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

67. As described herein, Karpeles engaged in unlawful, deceptive, and unfair conduct.

68. Through Mt. Gox's online marketing materials and advertisements, including its Terms of Use, Karpeles represented to Plaintiff and the Mt. Gox Class that Mt. Gox would, *inter alia*, protect their bitcoins and Fiat Currency, and safely and quickly allow them to buy, sell, trade, or withdraw the same.

69. However, as discussed above, Karpeles did not—and never had any intention to—safeguard or protects his users' bitcoins and Fiat Currency.

70. Thus, Karpeles' representations to Plaintiff and the members of the Mt.

15

Gox Class were knowingly and intentionally false.

71. Knowing that consumers are less likely to do business with companies that fail to adequately safeguard and hold their bitcoins and Fiat Currency or allow them to buy, sell, trade, or withdraw the same, Karpeles made these false representations with the intention that Plaintiff and the members of the Class would rely on them in contracting with Mt. Gox and transferring money and Bitcoin into their accounts.

72. Karpeles additionally made false representations to Plaintiff and the members of the Class through Mt. Gox's online Support Desk and in its customer service correspondence, which he controlled and directed, as described in Paragraphs 15, 29, and 33, *supra*. In particular, Karpeles falsely claimed that Mt. Gox's withdrawal and deposit issues were only temporary, that withdrawals would soon resume, that he was developing new business relationships with other banks for improved transaction capabilities, and that a security "bug" in Mt. Gox's system was the cause of its suspended withdrawals.

73. Karpeles further concealed the fact that Mizuho was no longer providing international withdrawal services, and thus, U.S. customers had effectively no means to withdraw deposited cash from the Exchange, and that thousands of user bitcoins had been lost or stolen.

74. Knowing that users would stop depositing bitcoins and funds in their accounts, and rather, would attempt to withdraw funds or close accounts if made aware of any large-scale loss/theft of coins, Karpeles made the false representations and omissions with the intent that Plaintiff and the members of the Class would rely on them and continue to deposit money and bitcoins into their Mt. Gox accounts and not attempt to withdraw funds and/or close accounts.

75. Had Karpeles disclosed Mt. Gox's true practices and intentions, Plaintiff and the members of the Class would have stopped depositing cash and/or bitcoins

16

into their Mt. Gox accounts, immediately taken any available steps to remove their assets from the Exchange, or would not have maintained accounts with Mt. Gox at all.

76. Accordingly, Karpeles' fraudulent conduct caused Plaintiff and the Class to suffer actual harm in the amount of the difference between the bitcoins or Fiat Currency that was in their Mt. Gox accounts at the time it went dark and the amount that will be actually returned to them under the liquidation proceedings in Mt. Gox's Japanese bankruptcy.

77. Plaintiff and the Class seek to recover the economic injury and other damages suffered as a result of Defendant Karpeles' unlawful conduct in the form of the price of the bitcoins and Fiat Currency in their Mt. Gox accounts that cannot be recovered.

**THIRD CAUSE OF ACTION**
**Tortious Interference With Contract Against Defendant Mizuho Bank**
**(On behalf of Plaintiff and the Withdrawal Subclass)**

78. Plaintiff hereby incorporates all allegations as if fully set forth herein.

79. Plaintiff entered into consumer agreements with Mt. Gox wherein Mt. Gox agreed to hold their bitcoins and Fiat Currency in the consumer's account, in the consumer's name, and on the consumer's behalf, and to allow the consumer to safely and quickly buy, sell, trade, or withdraw the same.

80. Defendant Mizuho had actual or constructive knowledge of such customer agreements.

81. Notwithstanding, in mid-2013, Mizuho went a step further and decided to stop processing all withdrawal requests made by any Mt. Gox user in the United States.

82. Mizuho knew that its new policies made it virtually impossible for Mt. Gox to fulfill its contractual obligations to Plaintiff and the Classes, and directly caused Mt. Gox to breach said contracts. As such, Mizuho played an active and

substantial part in causing Plaintiff and the Classes to lose the benefits of their contract with Mt. Gox.

83. Mizuho did not have authority or justification to interfere with Plaintiff's and the Class' contracts with Mt. Gox and/or their abilities to enjoy the benefits of their agreements. Rather, as explained in Paragraphs 22-28, *supra*, Mizuho Bank purposefully implemented such policies so as to pressure Mark Karpeles into closing Mt. Gox's account with Mizuho and terminating their business relationship, and to avoid reputational harm. And Mizuho effectively prevented Withdrawal Class members from taking any steps to mitigate the resulting harm by concealing the actions it was taking.

84. As a result of Mizuho's conduct, Plaintiff and the Class have suffered damages in the amount of currency they attempted to, but were unable, withdraw from the Exchange.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Jonathan Carmel, individually and on behalf of the Classes, pray for the following relief:

(a) An order certifying the Classes as defined above, appointing Plaintiff as representative of the Classes, and appointing his counsel as Class Counsel;

(b) An award of actual damages;

(c) An award of restitution for Defendants' wrongful conduct;

(d) An award of reasonable attorneys' fees and costs;

(e) An award of punitive or exemplary damages;

(f) An award of interest;

(g) Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

18

Respectfully submitted,

**JONATHAN CARMEL,** individually and on behalf of all others similarly situated,

Dated: March 27, 2018

By: /s/ Rafey S. Balabanian

One of Plaintiff's Attorneys

Rafey S. Balabanian (315962)
rbalabanian@edelson.com
Aaron Lawson
alawson@edelson.com (319306)
EDELSON PC
123 Townsend Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiff and the Putative Classes*

19